UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
Neron Dozier, *pro se*,                             :
                                                    :
                    Petitioner,                     :
                                                    :
    -against-                                       :
                                                    :
Michael McGinnis, Superintendent                    :
Southport Correctional Facility                     :
                                                    :
                    Respondent.                     :
--------------------------------------------------X

**MEMORANDUM AND ORDER**

05-CV-3678 (DLI) (RML)

**DORA L. IRIZARRY, U.S. District Judge:**

On May 23, 2001, Neron Dozier ("petitioner") was convicted in New York State Supreme Court, Queens County, of second degree murder, first degree reckless endangerment, and criminal possession of a weapon in the second and third degrees. He was sentenced to serve concurrent terms of twenty-five years to life for the murder, three-and-a-half to seven years for reckless endangerment, ten years for possession of a weapon in the second degree, and five years for possession of a weapon in the third degree. The Appellate Division, Second Department, affirmed petitioner's conviction on May 27, 2003, *People v. Dozier*, 305 A.D.2d 696 (2d Dep't 2003), and the New York Court of Appeals denied petitioner leave to appeal on July 22, 2003, *People v. Dozier*, 100 N.Y.2d 580 (2003). Successive petitions for writs of error *coram nobis* were rejected by the Appellate Division in 2004 and 2006, and the New York Court of Appeals denied leave to appeal in both instances, *People v. Dozier*, 11 A.D.3d 554 (2d Dep't 2004), *leave to appeal denied*, 5 N.Y.3d 827 (2005); *People v. Dozier*, 28 A.D.3d 789 (2d Dep't 2006), *leave to appeal denied*, 7 N.Y.3d 812 (2006). Petitioner did not seek a writ of certiorari from the United States Supreme Court.

Petitioner brings the instant petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his conviction on the grounds that (1) the state's evidence was insufficient to convict him because the trial witnesses were unreliable; (2) he received ineffective appellate representation when counsel failed to argue on appeal that petitioner was wrongly excluded from side-bar conferences during *voire dire*, that the prosecution failed to prove the victim's death, and that the judge's identification charge to the jury was unconstitutional; (3) he was denied the right to a fair trial because the witnesses' in-court identifications were tainted by suggestive pre-trial identifications; and (4) he received ineffective appellate representation when counsel failed to secure the written decision from a pretrial *Wade* hearing. Respondent opposes the petition on the grounds that petitioner's sufficiency and due process claims are barred by adequate and independent state law grounds, that the state court decisions rejecting petitioner's ineffective assistance of counsel claims were not contrary to, or unreasonable applications of, clearly establish Supreme Court law, and that petitioner's final ineffective assistance of counsel claim lacks merit. For the reasons set forth below, the petition is denied in its entirety.

I.      **Background**

    A.      The Shooting of Derrick Gilmore

At approximately 10:00 a.m. on May 13, 2000, Derrick Gilmore was murdered while sitting in the driver's seat of his red sports-utility vehicle ("SUV"), stopped at a traffic light, at the intersection of 38th Street and 21st Avenue in Queens. (Tr. 293-94.)[1] Luis Figueroa was sitting in the front passenger seat of Gilmore's vehicle when he heard four or five loud popping noises and the sound of shattered glass. (*Id*. at 293-94, 343.) Realizing they were being shot at, Gilmore fell on Figueroa, and both men ducked down in the vehicle to avoid being hit. (*Id*. at

---

[1] Page references preceded by "Tr." refer to the transcript of the trial held May 8 to May 23, 2001.

295.) After the gunfire abated, Gilmore started to drive away and Figueroa looked out the passenger window and observed petitioner, standing in front of a green SUV, looking back at him. (*Id*. at 295-96.) Figueroa knew petitioner well; they were incarcerated together in 1993 and 1995, and after Figueroa moved to Queens in 1998, the two socialized together daily. (*Id*. at 285-87.) Attempting to turn a corner, Gilmore lost consciousness and crashed his vehicle into a parked van. (*Id*. at 298.) Figueroa, noticing petitioner's truck in pursuit, attempted to drive Gilmore's vehicle in reverse but the vehicle stalled. (*Id*.) Figueroa then observed petitioner pass "right in front of [him]" in the green SUV and speed away. (*Id*. at 299.) Realizing that Gilmore was badly injured and that the vehicle was immobilized, Figueroa attempted to aid Gilmore and screamed for someone to call an ambulance. (*Id*. at 300.)

Ronald Griffin, a retired police officer, was standing across the street at an automotive repair shop when he witnessed the shooting. (*Id*. at 439-40.) Griffin testified that after stepping outside of the repair shop to smoke a cigarette, he heard four to five gunshots and observed petitioner, approximately twenty-five feet away, armed with a handgun and standing on the rear driver's side of a red vehicle that was stopped at an intersection. (*Id*. at 440-42, 448.) After petitioner fired his weapon, Griffin observed him stare briefly in the direction of an Amoco gas station, jog towards a nearby green SUV, enter it, drive past where Griffin was standing, and speed away around the corner. (*Id*. at 445-47, 471-72.) Griffin testified that he saw petitioner's face through the driver's side window as petitioner drove past him. (*Id*. at 447-48.)

Lycia Livingston also witnessed the shooting. Livingston was standing outside her vehicle at an Amoco gas station, waiting for her ex-husband to pay for gas, when she saw petitioner exit a "turquoise van," approach a red SUV stopped two cars in front of him, take out a

3

weapon, and stand behind the red SUV on the driver's side.  (*Id*. at 559-63, 590-94.)  She then heard three to four shots.  (*Id*. at 562.)  According to Livingston, petitioner then noticed her looking at him and pointed his finger at her, simulating a gun.  (*Id*. at 563-64.)  Petitioner then walked back to his vehicle, entered it and drove away, following the red SUV.  (*Id*. at 565.) Livingston stated at trial that she was standing approximately twenty feet away from where the shooting occurred.  (*Id*. at 570.)  After petitioner drove away, Livingston finished purchasing gas, went to eat breakfast with her family, and returned to the crime scene to give information to the police.  (*Id*. at 566-67.)

     B.    <u>The Crime Scene</u>

Once the green SUV had driven away, Griffin called 911 to report the incident, retrieved yellow "caution" tape from the trunk of his car, and began cordoning off the area where the shooting occurred.  (*Id*. at 449-50.)  When the police arrived, Griffin showed the officers his retired police shield and offered to keep the crime scene secure while the officers looked after Gilmore and Figueroa.  (*Id*. at 451.)  Griffin also informed the police he could identify the shooter, and gave the police a description.  (*Id*. at 451-52.)  When Livingston returned to the crime scene, she also spoke with the police about what she had witnessed.  (*Id*. at 601.)  When the responding officers reached Figueroa, he stated that the shooter was a black male, but he did not indicate that he knew petitioner's name because he "was scared" and his "friend was shot." (*Id*. at 353.)

Police Officer Nicholas Leo testified that, upon arriving at the scene and seeing an unconscious Gilmore and a frantic Figueroa, he called an ambulance, which took Gilmore to the hospital.  (*Id*. at 376.)  After Figueroa learned that Gilmore was pronounced dead, Figueroa told

police that petitioner was the shooter. (*Id.* at 355-56.) The medical examiner who performed the autopsy on the shooting victim recovered from the crime scene, then identified only by case number "00Q2129," testified that the victim's death was caused from "gunshot wounds to the torso and left upper extremity with perforations of the spleen, of the stomach, of the heart, of the lung and of major blood vessels." (*Id.* at 400, 408.) On May 14, 2000, Officer Leo visited the morgue and identified the body in case number 00Q2129 as that of Derrick Gilmore, the victim taken from the crime scene the previous day. (*Id.* at 378, 400.)

C.     Petitioner's Identification and Arrest

On May 13, 2000, the police conducted two in-house photo arrays at their precinct. (Wade Hrg. 6-7.)[2] The police displayed petitioner's photograph—procured from their internal computer records—along with the photographs of six other individuals. (*Id.* at 7, 21.) The two photo arrays were viewed by Figueroa and Griffin, both of whom identified petitioner as the shooter. (*Id.* at 7-9.) On May 18, 2000, at approximately 4:00 p.m., Livingston was entering a convenience store on the corner of 40th Avenue and 10th Street in Queens when she observed petitioner standing outside and talking with several other individuals. (Tr. 572.) As Livingston left the store, petitioner, seeming to recognize Livingston, pointed at her. (*Id.* at 573.) Livingston left the store, returned to her apartment, and then called the police from to report seeing petitioner. (*Id.* at 574-76.) Sometime later that afternoon, Livingston met with the police at the precinct and identified petitioner as the shooter after being shown a photo array.[3] (*Id.* at 576-77; Wade Hrg. 9.)

---

[2] Page references preceded by "Wade Hrg." refer to the transcript of the *Wade* hearing held on February 22, 2001.
[3] Although somewhat unclear from the record, the parties, in their submissions to the court, appear to acknowledge that Griffin and Figueroa were shown photo arrays on May 13, and that Livingston was shown the photo array on May 18. (*See* ECF Docket Entry 1 at 14; ECF Docket Entry 17 at 39.)

On June 19, 2000, petitioner surrendered to the police at his attorney's office and was taken into custody. (*Id*. at 492-495.) At the precinct, petitioner was processed and placed in a lineup of six people. (*Id*. at 495-501.) Both Griffin and Livingston viewed the lineup and identified petitioner as the shooter. (*Id*. at 453-54, 496-501, 578-79.) Later that day, Figueroa, who was unable to come to the station when Griffin and Livingston viewed the line-up, was shown a Polaroid photograph of petitioner and identified him as the shooter. (Wade Hrg. 16; *see* Tr. 285-88.) Because the police knew that Figueroa was acquainted with petitioner prior to the shooting, the police determined that he could identify petitioner via a photo confirmation. (Wade Hrg. 16-17; *see* Tr. 285-88.)

D.    Trial Court Proceedings

On August 17, 2000, petitioner was indicted for second degree murder, attempted murder in the second degree, first degree reckless endangerment, and second and third degree criminal possession of a weapon. (Queens County Indictment Number 2495/00.) Thereafter, petitioner moved to suppress evidence of the photo and line-up identifications at trial, and a *Wade* hearing before Justice Robert J. Hanophy was held on February 22, 2001. (*See* Wade Hrg. 1-23.) In a written decision dated April 11, 2001, the court found that the identification evidence was admissible because the prosecution had sufficiently demonstrated that the police used reasonable identification procedures, which were not unduly suggestive. *People v. Dozier*, Ind. No. 933/00 (N.Y. Sup. Court, Queens Co., Apr. 11, 2001). The court did, however, order a *Rodriguez* hearing to determine whether Figueroa and petitioner knew each other so well that no amount of suggestiveness could have tainted the single Polaroid identification procedure conducted on June

19, 2000. *Id.* At the *Rodriguez* hearing, the court determined that Figueroa and petitioner were well enough acquainted to allow the Polaroid identification into evidence. (Tr. 285-88.)

Before the jury was impaneled for petitioner's trial, defense counsel gave the court a signed *Antommarchi* waiver, indicating that petitioner waived his right to be present at side bar conferences during *voire dire*.[4] (*Id*. at 19-20.) Petitioner stated on the record that he understood the waiver's contents, and that his lawyer had explained the waiver to him. (*Id.*)

During the course of the trial, the jury heard testimony from a number of witnesses. Figueroa testified about petitioner's involvement in the events surrounding the shooting, and Griffin and Livingston each testified that they witnessed petitioner shoot Derrick Gilmore. (*Id*. at 294-99, 442, 561-62.) In response to questions regarding his criminal history, Figueroa acknowledged that he had at least thirteen prior convictions, and he admitted to testifying in hopes of receiving a favorable recommendation on drug charges pending against him at the time of trial, but he stated that no deal had been offered in exchange for his testimony. (*Id*. at 326-38.) When Livingston was questioned about her background, she admitted to having several decades-old convictions for prostitution, to having received psychiatric care in the past for trauma and depression after being raped, and to having received psychiatric care during the week of petitioner's trial "because of the case." (*Id*. at 583-86, 607.)

At the close of a ten-day trial, the court gave the jury its instructions, including the following charge concerning the identification evidence that had been presented:

> In this case, as you are now aware, the only evidence which in any way establishes or tends to establish that defendant is the actual perpetrator, is the right man, is the testimony of eyewitnesses Lycia Livingston and Ronald Griffin.

---

[4] In *People v. Antommarchi*, the New York Court of Appeals held that a criminal defendant was denied his constitutional and statutory right to be present during all material stages of his trial when he was excluded from the court's *voire dire* of prospective jurors. 80 N.Y.2d 247 (1992).

With respect to each of these eyewitnesses, apart from his or her testimony that the defendant is the right man, there is no other evidence whatsoever which identifies defendant as the perpetrator. In such case, the law requires that the jury be satisfied that the identification testimony of each witness is as certain as human recollection permits under the most favorable circumstances.

(*Id*. at 707-08.) After deliberating, the jury convicted petitioner of second degree murder, first degree reckless endangerment, and criminal possession of a weapon in the second and third degrees. (*Id*. 767-73.) On June 21, 2000 petitioner was sentenced to serve concurrent terms of twenty-five years to life, three-and-a-half to seven years, five years, and ten years. (Sent. 8).[5]

E.    Appellate and Collateral Proceedings

Petitioner appealed his conviction to the Appellate Division, arguing that the prosecution failed to prove his guilt beyond a reasonable doubt because three of the trial witnesses— Figueroa, Griffin, and Livingston—were "deeply problematic." (ECF Docket Entry 1, att. 2 at 3.) The Appellate Division affirmed the conviction on May 27, 2003, finding petitioner's argument unpreserved for appellate review, and that "[i]n any event, viewing the evidence in the light most favorable to the prosecution . . . it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt." *Dozier*, 305 A.D.2d at 696. The New York Court of Appeals denied petitioner leave to file to appeal on July 22, 2003. *Dozier*, 100 N.Y.2d 580. On May 13, 2004, petitioner filed a *pro se* motion in the Appellate Division for a writ of error *coram nobis* claiming that he was denied the effective assistance of appellate counsel on his direct appeal because counsel had failed to argue that (1) petitioner's *Antommarchi* waiver was inadequate, (2) that the prosecution failed to prove the fact of the victim's death beyond a reasonable doubt, and (3) that the trial court's identification charge to the jury amounted to a directed verdict. The Appellate Division rejected petitioner's claims on October 12, 2004, finding that petitioner had

---

[5] Page numbers preceded by "Sent." refer to the transcript of the sentencing proceedings conducted in Queens County Supreme Court on June 21, 2001.

"failed to establish that he was denied the effective assistance of appellate counsel." *Dozier*, 11 A.D.3d at 554. The Court of Appeals denied leave to appeal on September 30, 2005. *Dozier*, 5 N.Y.3d 827.

On July 28, 2005, petitioner timely filed the instant petition for a writ of habeas corpus in this court. Subsequently, on January 25, 2006, petitioner filed another *coram nobis* petition in the Appellate Division, arguing that his appellate counsel was ineffective for failing to argue that identification evidence obtained subsequent to a warrantless arrest should be suppressed under the "*Wong Sun* doctrine." The Appellate Division also rejected this claim, and the Court of Appeals again declined to take it under consideration. *Dozier*, 28 A.D.3d 789, *leave to appeal denied*, 7 N.Y.3d 812 (2006).

## II.     Discussion

### A.     Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), where claims in state court were "adjudicated on the merits," the federal district court may grant a petition for a writ of habeas corpus only upon a finding that the state court proceeding:

   (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

   (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000) (O'Connor, J.,

concurring and writing for the majority). Habeas relief is available under the "unreasonable determination" clause "if the state court identifies the correct governing principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the state court's application must have been objectively unreasonable. *Id.* at 409. In reviewing the state court decision, "a determination of a factual issue made by a State court shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Before the court can reach the substance of a petition's federal claim, however, the petitioner must have exhausted his or her state remedies, *Daye v. Attorney Gen.*, 696 F.2d 186, 190-91 (2d Cir.1982) (en banc), but the petitioner need only make a minimal articulation of the federal claim to the state courts, *see, e.g.*, *Reid v. Senkowski*, 961 F.2d 374, 376 (2d Cir. 1992). Moreover, a district court cannot review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule unless the prisoner can establish cause for the default and prejudice from the alleged federal violation, or the prisoner can demonstrate that failure to consider his claims will lead to a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007). If a state court's holding contains a plain statement that a claim is procedurally barred based on a state rule, the federal court may not review it even if the

state court also rejected the claim on the merits in an alternative holding. *See Harris v. Reed,* 489 U.S. 255, 264 n. 10 (1989).

B.    Petitioner's Claims

1.    *Insufficiency of the Evidence*

Petitioner first alleges that the prosecution's reliance on the testimony of three problematic witnesses—Figueroa, Griffin, and Livingston—rendered the evidence legally insufficient to convict him. Respondent argues that petitioner's challenge to the legal sufficiency of the evidence is procedurally barred because the Appellate Division found it unpreserved for appellate review as a result of petitioner's failure to comply with New York's preservation rule, which requires defense counsel to contemporaneously object to any alleged legal error at a criminal trial. *See* N.Y. Crim Proc. Law § 470.05(2). Federal habeas courts look to federal law to determine whether a state procedural bar precludes review of a federal question. *Garvey v. Duncan*, 485 F.3d 709, 714 (2d Cir. 2007).

The Appellate Division's holding that petitioner's claim was unpreserved for appellate review constitutes an "independent" ground of decision even though the court also discussed the merits of the underlying claim. *See Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) ("There is no question that the Appellate Division's explicit invocation of the procedural bar constitutes an 'independent' state ground, even though the court spoke to the merits of [the] claim in an alternative holding.") (citing *Harris*, 489 U.S. at 263, 264 n.10). An independent state law ground is "only adequate to support the judgment and foreclose review of a federal claim if it is 'firmly established and regularly followed' in the state," but "even firmly established and regularly followed state rules will not foreclose review of a federal claim if the application of the

rule in a particular case is 'exorbitant.'" *Garvey*, 485 F.3d at 713-14 (quoting *Lee v. Kemna*, 534 U.S. 362, 376 (2002)).

The Second Circuit has found New York's contemporaneous objection rule to be firmly established and regularly followed by the New York courts. *Garcia*, 188 F.3d at 78-79. Therefore, whether the instant petition is procedurally barred by section 470.05(2) turns on whether it would be exorbitant to apply the rule in this particular case. *Garvey*, 485 F.3d at 713-14. Although not a formal test, in *Lee v. Kemna*, the Supreme Court provided several guideposts to help federal habeas courts determine whether the application of a firmly established and regularly followed state procedural rule would be exorbitant:

(1)     whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision;

(2)     whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and

(3)     whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate government interest.

*Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (quoting *Lee*, 534 U.S. at 381-85).

Turning to the first *Lee* factor, the trial court clearly could not have relied on petitioner's violation of the contemporaneous objection rule—by definition, such a violation cannot occur until a party reaches the appellate court and attempts to raise an argument that has not been preserved. *See Garvey*, 485 F.3d at 719. This, however, does not foreclose the possibility that defense counsel's compliance with the rule might have affected the trial court's decision. Had defense counsel timely raised a sufficiency objection, it is possible that defense counsel "[t]hrough argument, or perhaps a request for an opportunity to brief the issue" might have

persuaded the court to reach a different conclusion. *Cotto*, 331 F.3d at 243; *cf. Lee*, 534 U.S. at 381. Accordingly, the first consideration from *Lee* fails to support a finding that the application of section 470.05(2) in petitioner's case was exorbitant.

Regarding the second and third *Lee* factors, the court must consider whether New York's contemporaneous objection rule is firmly established and regularly followed in the particular circumstances of petitioner's case, and whether petitioner "substantially complied" with that rule given the realities of trial. *See Lee*, 534 U.S. at 382; *Cotto*, 331 F.3d at 244. It is well established that New York courts will not review unpreserved claims of legal insufficiency, and that even general objections to the sufficiency of the evidence are inadequate to preserve specific sufficiency challenges later raised on appeal. *People v. Finger*, 95 N.Y.2d 894, 895 (2000); *People v. Gray*, 86 N.Y.2d 10, 19 (1995). Where, as here, a defendant makes no objection to the legal sufficiency of the evidence, that defendant cannot be said to have substantially complied with section 470.05(2). *See Garvey*, 485 F.3d at 714 (collecting cases). Accordingly, the factors from *Lee* provide no support for finding the Appellate Division's application of the preservation rule exorbitant. *See Richardson*, 497 F.3d at 220 ("Where the case law interpreting New York's preservation rule in criminal proceedings displays consistent application in a context similar to the one before us, that rule is firmly established, regularly followed, and hence adequate for purposes of the independent and adequate state ground doctrine."). The court holds that New York's preservation rule constituted an adequate ground of decision independent of petitioner's federal claim.

Even when habeas claims are barred by an adequate and independent state ground, a federal court can consider the claim despite the procedural bar if "the prisoner can demonstrate

cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. The only cause for the default here was petitioner's trial counsel's failure to object, and default resulting from inadvertence or negligence is not considered "cause" for a default. *Id*. at 753. "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Amadeo v. Zant*, 486 U.S. 214, 222 (1988) (quoting *Murray v. Carrier,* 477 U.S. 478, 488 (1986). No such external cause is alleged here. Petitioner is further unable to overcome the default by claiming a fundamental miscarriage of justice because he has failed to put forward any new evidence suggesting that he is innocent of the underlying crimes. *See Schlup v. Delo*, 513 U.S. 298, 324 (1995). Because the Appellate Division's decision rests upon an adequate and independent state law ground, petitioner is procedurally barred from presenting his legal sufficiency claim to this court.

### 2.  *Ineffective Assistance of Appellate Counsel*

Petitioner next claims he is entitled to habeas relief because his appellate counsel was constitutionally ineffective for failing to argue that: (1) the trial court denied petitioner his right to be present at side-bar conferences during *voire dire*, (2) the prosecution failed to prove the death of Derrick Gilmore beyond a reasonable doubt, and (3) the court's identification charge to the jury amounted to a directed verdict. Petitioner presented these claims in a *coram nobis* petition, and the Appellate Division summarily denied them in a written decision that the New York Court of Appeals declined to review. *Dozier*, 11 A.D.3d 554, *leave to appeal denied*, 5

N.Y.3d 827. Accordingly, petitioner's ineffective assistance claims have been exhausted. *See Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005). Moreover, the Appellate Division adjudicated these claims on the merits, even though it did not explain its reasoning, because its written decision expressly stated that petitioner had failed to establish his ineffective assistance of counsel claim. *See Sellan v. Kuhlman*, 261 F.3d 303, 314 (2d Cir. 2001). Accordingly, the court, under AEDPA, is prevented from reviewing petitioner's claims *de novo* and must instead determine whether the Appellate Division's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. 2254(d)(1).

In *Strickland v. Washington*, the Supreme Court held that in order to establish an ineffective assistance of counsel claim, a defendant must show both "that counsel's representation fell below an objective standard of reasonableness" and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). When a habeas petitioner seeks to demonstrate that his appellate counsel's failure to raise a claim in state court was objectively unreasonable, the petitioner must show more than that counsel declined to present a nonfrivolous argument. *Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000) (citing *Jones v. Barnes,* 463 U.S. 745, 754 (1983). "[I]ndeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy." *Youngblood v. Brown*, 465 F. Supp. 2d 270, 282 (S.D.N.Y. 2006) (quoting *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989)). Petitioner must instead establish "that counsel omitted significant and obvious issues while pursuing issues

that were clearly and significantly weaker." *Clark*, 214 F.3d at 322 (quoting *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994)).

Petitioner first alleges that his counsel was ineffective for failing to argue on appeal that his conviction should be reversed because petitioner was denied his right to be present at side-bar conferences during *voire dire*. In *People v. Antommarchi*, the New York Court of Appeals held that a criminal defendant's fundamental right to be present at all material stages of his trial includes the right to be present at any side-bar conference where the background and objectivity of a prospective juror is discussed. 80 N.Y.2d 247, 250 (1992). Before any jurors were questioned at petitioner's trial, defense counsel gave the trial judge a signed document in which petitioner waived his rights under *Antommarchi*. Petitioner stated on the record that he understood the waiver, and that counsel had explained the waiver to him. Petitioner contends, however, that this waiver was invalid because it was based upon his mistaken belief that in order to participate in any side-bar conferences, he would have to be handcuffed and escorted to the bench by court officers, in full view of the jury. Given petitioner's signed waiver, and his on-the-record acknowledgment of that waiver, it is highly unlikely that the appellate court would have been persuaded by petitioner's argument. *See*, *e.g.*, *People v. Vargas*, 88 N.Y.2d 363, 373-76 (1996) (upholding *Antommarchi* waiver despite trial judge's statement that if defendant wanted to be present at side-bar conferences, "there'll be a number of court officers surrounding him at all times"). Therefore, it cannot be said that counsel acted unreasonably by omitting this issue from the brief.

Petitioner next claims his appellate counsel was ineffective for not arguing that the prosecution failed to establish the fact of Gilmore's death. Petitioner claims that the dearth of

evidence presented from the medical examiner or family members that identified the victim as Derrick Gilmore rendered the prosecution's proof legally insufficient to support a murder conviction. New York courts have noted, however, that the prosecution is "not required to prove the identity of [a] victim's body in order to prove that the defendant caused [the] death." *People v. Applegate*, 176 A.D.2d 888, 889 (2d Dep't 1991). Moreover, it is well established under New York law that the identity of a murder victim may be proven by circumstantial evidence. *See People v. Palmer*, 109 N.Y. 110 (1888). In this case, Figueroa testified that he was seated next to Gilmore in Gilmore's car when Gilmore was shot, and that he was present when the police arrived. The first officer on the scene, Nicholas Leo, testified that he saw the body at the scene and later identified it at the morgue. The medical examiner testified at length about the autopsy he performed on the body that Officer Leo identified as Derrick Gilmore. This circumstantial evidence was more than sufficient to allow the jury to infer that Derrick Gilmore, the person shot at the crime scene, was the same person pronounced dead from gunshot wounds several hours later. Petitioner's counsel did not act unreasonably by sparing the Appellate Division this argument.

Finally, petitioner claims his appellate counsel was deficient for not arguing that the trial court committed reversible error when it instructed the jury that "the only evidence which in any way establishes or tends to establish that defendant is the actual perpetrator . . . is the testimony of eyewitnesses Lycia Livingston and Ronald Griffin." (Tr. 707.) Petitioner claims this instruction wrongly influenced the jury and amounted to a directed verdict. Jury instructions do not constitute directed verdicts so long as they do not encroach upon the exclusive fact-finding function of the jury by preventing the jury from considering some element of, or a defense to, the

crime charged.  *See People v. Goetz*, 73 N.Y.2d 751, 753 (1988).  The court agrees with respondent that the trial judge was merely reminding the jury that the only evidence directly implicating petitioner as the one who shot Gilmore was the eyewitness testimony of Griffin and Livingston.  (*See* ECF Docket Entry 17 at 31.)  As such, appellate counsel acted reasonably by omitting this issue from the brief.  Because appellate counsel's disregard of petitioner's putative *Antommarchi*, fact-of-death, and jury charge claims was not objectively unreasonable under *Strickland* and its progeny, the Appellate Division's decision finding counsel's representation constitutionally effective was not contrary to, or an unreasonable application of, clearly established federal law.

### 3.    *Due Process*

Petitioner's next proposed basis for habeas relief concerns the identification evidence put forward at the trial.  Specifically, petitioner alleges that the photo arrays the police showed Griffin and Livingston prior to trial were improper and unduly suggestive, and that therefore, Griffin's and Livingston's subsequent in-court identifications deprived petitioner of his due process right to a fair trial under the Fourteenth Amendment.  Petitioner raises this claim for the first time in the present habeas petition submitted to this court.  Under the habeas statute, a state prisoner's habeas petition may not be granted unless the petitioner has exhausted the available state court remedies, no corrective state process is available, or other existing circumstances render such state process ineffective to protect the petitioner's rights.  28 U.S.C. 2254(b)(1).

In order to exhaust available state remedies, a habeas petitioner must give the state court of last resort "a fair opportunity to pass on his federal claim."  *Morgan v. Bennett*, 204 F.3d 360, 369 (2d Cir. 2000) (citations omitted).  The exhaustion requirement, grounded in principles of

comity, exists to reduce friction between federal and state sovereigns by preventing a federal court from upsetting a state conviction without first providing the state courts an opportunity to consider the prisoner's federal claim. *Galdamez*, 394 F.3d at 72 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999)). In the present case, petitioner is presenting his constitutional claim to this court without having given the New York courts a fair opportunity to consider its merits. Petitioner did argue at the pre-trial *Wade* hearing that the police's photo arrays were unduly suggestive, but he failed to object to Griffin's or Livingston's testimony at trial, and he did not challenge the suppression ruling on direct appeal. Petitioner thus failed to exhaust his available state court remedies. *See Bumpus v. Superintendent of Clinton Corr. Facility*, 507 F. Supp. 2d 246, 258 (E.D.N.Y. 2007) (The exhaustion requirement is not satisfied in New York unless "the habeas petitioner . . . raised the federal issue in an appeal to the Appellate Division and then in an application to the Court of Appeals for leave to appeal.") (citing *Galdamez*, 394 F.3d at 74).

The habeas statute, however, provides that an unexhausted claim may be deemed exhausted if "there is an absence of available State corrective process." 28 U.S.C.A. § 2254(b)(1)(B)(i); *see also Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001). This "exception applies if, *at the time the petitioner files the federal petition*, there is no available state procedure by which she can secure review of the relevant claim." 2 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice and Procedure § 23.4 at 1093 (5th ed. 2005). The exception, however, is much narrower than it first appears; the Supreme Court has held that habeas review will still be foreclosed, pursuant to a procedural default, if the "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now

find the claims procedurally barred." *Clark v. Perez*, 510 F.3d 382, 390 (2d Cir. 2008) (quoting *Coleman*, 501 U.S. at 735 n. 1); *see also Aparicio*, 269 F.3d at 90. Thus, the court must look to New York's procedural rules to determine whether it may review the merits of plaintiff's due process claim. *See Sweet v. Bennett*, 353 F.3d 135, 139 (2d Cir. 2003).

As discussed above, New York's preservation rule requires a party to contemporaneously object to any alleged legal error at trial in order to use the alleged error as a ground for appeal. N.Y. Crim Proc. Law § 470.05(2). At his trial, petitioner failed to preserve his due process claim by objecting to the identification testimony of Griffin or Livingston. These claims could not now be presented to the Appellate Division, for they would be found unpreserved. Nor could petitioner's due process claim be considered in the interests of justice, or on collateral review, as New York forecloses those avenues to parties that have expended their one direct appeal and leave application. *See, e.g.*, *Rolling v. Fischer*, 433 F. Supp. 2d 336, 347 (S.D.N.Y. 2006) (citing *St. Helen v. Senkowski,* 374 F.3d 181, 183-84 (2d Cir. 2004); N.Y. Court Rules § 500.20(a); N.Y. Crim. Proc. Law § 440.10). Petitioner's due process claim would thus be procedurally defaulted in state court. Because petitioner cannot show the requisite cause and prejudice for this default, the court rejects this claim without reaching its merits. *See Daniel v. Conway*, 498 F. Supp. 2d 673, 679 (S.D.N.Y. 2007) (citing *Grey v. Hoke*, 933 F.2d 117, 120-21 (2d Cir. 1991)).

### 4. *Ineffective Assistance of Appellate Counsel (Wade Hearing Decision)*

Petitioner last argues that his appellate counsel was ineffective for failing to secure the written decision from the pre-trial *Wade* hearing. Petitioner raises this claim for the first time before this court. That this claim is also unexhausted, however, is irrelevant because it is plainly devoid of merit. The Supreme Court has noted that district courts would abuse their discretion

by staying habeas proceedings in order to allow petitioners to exhaust meritless claims, *Rhines v. Weber*, 544 U.S. 269, 277 (2005), and district courts in this circuit have begun denying mixed habeas petitions—consisting of both exhausted and unexhausted claims—on the merits where the unexhausted claims obviously lack merit, *see Velazquez v. Poole*, 04-CV-00478, 2007 WL 3240550 at *14 n. 14 (E.D.N.Y. Oct. 30, 2007) (collecting cases).

As noted above, to succeed on an ineffective assistance claim in the appellate setting, a habeas petitioner must demonstrate that counsel pursued claims obviously inferior to those that were omitted, and that a reasonable probability exists that the omitted claims, had they been presented, would have been successful before the state's highest court.  *Mayo,* 13 F.3d 533; *Claudio v. Scully,* 982 F.2d 798, 803 (2d Cir.1992).  Even assuming that petitioner's appellate counsel did in fact fail to acquire the decision from the *Wade* hearing, petitioner's claim falls well short of what is required.  Even without the written decision,[6] counsel had access to the transcripts of both the *Wade* hearing and the trial, which were sufficient to inform counsel that petitioner had attempted and failed to suppress the relevant identification evidence.  (*See* ECF Docket Entry 1, att. 3 at 26-29.)  Moreover, the correspondence between petitioner and counsel,

---

[6] After briefly summarizing the facts that were laid out at the hearing, the entire written decision at issue consisted of the following:

> At this *Wade* hearing, the People have the burden of going forward with the evidence showing that the identification procedure was proper.  Once that burden has been met, the defendant bears the burden of proving that the identification procedure was unduly suggestive.
> In the present case, the Court finds that the People have met their burden of coming forward with evidence establishing that the police conduct was reasonable and that the identification procedures utilized were not suggestive.  Here, there was no credible evidence presented to show that any of the identification procedures were unnecessarily suggestive, impermissible or conducted improperly.
> However, with respect to the June 19, 2000 single polaroid photograph identification procedure that was conducted, the Court finds that orders that [sic] a *Rodriguez* hearing be conducted immediately prior to trial by the trial court.
> Accordingly, the defendant's motion to suppress is denied in part and granted in part to the extent that a *Rodriguez* hearing is to be conducted immediately prior to trial.

*People v. Dozier*, Ind. No. 933/00 at 3-4 (N.Y. Sup. Court, Queens Co., Apr. 11, 2001).  As noted above, a *Rodriguez* hearing was subsequently held and is indicated in the trial transcript.  (Tr. 285-88.)

which the former attached as an exhibit to his petition, demonstrates that counsel was apprised of petitioner's interest in pursuing a claim based on the *Wade* hearing. (*Id.*) Being armed with this knowledge, counsel's decision to omit the *Wade* hearing claim from the appellate brief can only be described as strategic. Because nothing in the record indicates that the claim counsel did present—based on the sufficiency of the evidence—was "clearly and significantly weaker" than an omitted claim challenging the suppression ruling that followed the *Wade* hearing, counsel cannot be said to have acted unreasonably. *See Clark*, 214 F.3d at 322. As such, petitioner's final claim for ineffective assistance of counsel is rejected for want of merit.

## III.    Conclusion

For the reasons set forth above, Neron Dozier's petition for a writ of habeas corpus is denied in its entirety. Petitioner is further denied a certificate of appealability as he fails to make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see* Fed. R. App. P. 22(b); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000).


SO ORDERED.

DATED:    Brooklyn, New York
          March 26, 2008


_____/s/_____
          DORA L. IRIZARRY
          United States District Judge